IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MOLLY RIZZI,

                    Plaintiff,

vs.                                              Civ. No. 07-814 JCH/RLP

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY a/k/a
THE HARTFORD,

                    Defendant.


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiff's *Motion for Judgment on the Administrative Record*, filed May 12, 2008 [Doc. 19] and Defendant's *Motion for a Bench Trial on the Papers*, filed May 13, 2008 [Doc. 20].  The Court having thoroughly reviewed the administrative record, and having carefully considered the motions, briefs, and relevant law (including the supplemental authorities submitted by the parties), and being otherwise fully informed, finds that Plaintiff's motion for judgment on the administrative record is not well taken and is DENIED, and Defendant's motion for a bench trial on the papers, which the Court is treating as a motion for judgment on the pleadings, is GRANTED.

## BACKGROUND

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").  Plaintiff Molly Rizzi ("Rizzi") filed a claim for total disability benefits under a long term disability policy issued by and administered by Defendant Hartford Life and Accident Insurance Company ("Hartford") and offered to the employees of Plaintiff's former

employer, Sprint/United Management Company ("Sprint").  Plaintiff initially filed her claim with Defendant for long term disability ("LTD") benefits on August 23, 2005, citing wrist, arm, head, and neck pain and the inability to use her right extremities properly.  Plaintiff had been receiving short term disability payments for the same condition since April 4, 2005, retroactive to March 28, 2005, the first workday after her last day working at Sprint, and those payments were set to expire on September 28, 2005.

Defendant approved payment of LTD benefits on October 21, 2005, with an effective date of September 28, 2005, pursuant to Sprint's group benefits plan ("the Plan").  On June 7, 2006, following an investigation and re-evaluation of Plaintiff's claim, Defendant discontinued payment of LTD benefits to Plaintiff.  Following an administrative appeals process provided for by ERISA, Hartford denied Rizzi's appeal on January 18, 2007.  Plaintiff timely filed her complaint for Breach of ERISA Rights in New Mexico State District Court on July 16, 2007, and Defendant properly removed the action to this Court on August 21, 2007.  At issue in this case is whether Defendant reasonably exercised its discretion to terminate Plaintiff's LTD benefit payments under the Plan.

## LEGAL STANDARD

Under ERISA, plan beneficiaries, such as Plaintiff, have the right to federal court review of benefit denials and terminations.  29 U.S.C. § 1132(a)(1)(B).  Although the default standard of review for a denial of benefits challenged under section 1132(a)(1)(B) is *de novo*, when the benefit plan gives the plan administrator or fiduciary the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, review must be under an arbitrary and capricious standard.  *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Trujillo v. Cyprus AMAX Minerals Ret. Plan Comm.*, 203 F.3d 733, 736 (10th Cir. 2000).  In this

case, the policy unambiguously gave the plan administrator discretion to determine eligibility for benefits and to construe the terms of the Plan.  *See* Administrative Record (hereinafter "Rec.") at 18 ("We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy").  *See also* Rec. at 32, 57, and 71 (further stating that the administrator has discretion to determine eligibility for benefits and to interpret terms of the Plan).  Therefore, the Court's review of Defendant's determination to terminate Plaintiff's LTD benefit payments must be under an arbitrary and capricious standard.

Under the arbitrary and capricious standard, the Court's review is limited to a determination of whether the administrator's interpretation of the plan was reasonable and made in good faith.  *See Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008).  The administrator's decision will be upheld "so long as it is predicated on a reasoned basis." *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).  As long as the basis for the decision is reasonable, the decision "need not be the only logical one, nor even the best one."  *Nance v. Sun Life Assur. Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)).  The decision must merely reside "somewhere on a continuum of reasonableness–even if on the low end."  *Kimber*, 196 F.3d at 1098.  A decision is arbitrary and capricious if it is "lacking in substantial evidence or contrary to law."  *Rademacher v. Colo. Assoc. of Soil Conservation Dist. Med. Benefit Plan*, 11 F.3d 1567, 1569 (10th Cir. 1993).  Substantial evidence is "'more than a scintilla but less than a preponderance'" and "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker."  *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1119-20 (10th Cir. 2006) (citation omitted).  In reviewing the administrator's decision, the Court must base its decision solely on the administrative record, *i.e.*, "'the materials compiled by the

administrator in the course of making his decision.'" *Weber*, 541 F.3d at 1011.  This restriction on

what the Court can consider in making its decision is especially important to recognize in benefits

denial cases, where a claimant's condition can change significantly after the close of the

administrative record.

An ERISA fiduciary that plays the roles of both determining eligibility for benefits and

paying benefits claims out of its own pocket has, by definition, a conflict of interest because the

administrator/insurer "may favor, consciously or unconsciously, its interests over the interests of

the plan beneficiaries."  *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 (10th Cir.

2004).  This conflict of interest must be taken into account as part of the Court's determination of

whether the administrator's decision was arbitrary and capricious.  *See Firestone*, 489 U.S. at 115

("if a benefit plan gives discretion to an administrator or fiduciary who is operating under a

conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an

abuse of discretion'") (citation omitted).[1]

After the parties completed briefing in this case, the Supreme Court issued a decision

clarifying how a court reviewing an ERISA claim should evaluate an inherent conflict of interest.

*See Metropolitan Ins. Co. v. Glenn*, 128 S. Ct. 2343 (June 19, 2008).  *Glenn* confirmed that an

inherent conflict of interest exists where a company acts as both payor and administrator of a

Plan.  *Id*. at 2349.  In discussing how such a conflict should be taken into account by a court

reviewing a discretionary benefit determination, the *Glenn* Court held that "*Firestone* means what

the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they

will often take account of several different considerations of which a conflict of interest is one."

---

[1] The Tenth Circuit treats the terms "arbitrary and capricious" and "abuse of discretion"
interchangeably in this context.  *See Weber*, 541 F.3d at 1010 n.10.

*Id*. at 2351.  The Court held that requiring that a conflict be weighed as a factor in evaluating whether the administrator has abused its discretion does not imply "a change in the *standard* of review, say, from deferential to *de novo* review."  *Id.* at 2350 (emphasis in original).  Rather, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance."  *Id*. at 2351.  The Court went on to explain that a conflict of interest should be viewed as more important where there is a greater likelihood that it affected the benefits decision, such as in a case where the administrator has a demonstrated history of biased claim decisions, and less important, "perhaps to the vanishing point," where the administrator has actively taken steps to reduce potential bias.  *Id.*

In discussing *Glenn*, the Tenth Circuit held that a court must "dial back" the deference it gives to an administrator if that administrator is operating under a conflict of interest.  *Weber*, 541 F.3d at 1010.  The *Weber* court found that *Glenn*'s method of accounting for a conflict of interest is mirrored by existing Tenth Circuit law, which "craft[s] a 'sliding scale approach' where the 'reviewing court will always apply an arbitrary and capricious standard but [will] decrease the level of deference given...in proportion to the seriousness of the conflict.'" *Id*. at 1011 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007)) (internal quotation omitted).

Plaintiff argues that, because an inherent conflict of interest exists with respect to the administrator, the burden of proof shifts to Defendant to demonstrate that its decision was supported by substantial evidence.  *See* Plaintiff's Response to Defendant's Motion for Bench Trial on the Papers (hereinafter "Pl. Resp."), [Doc. 22] at 3.  In making this argument, Plaintiff cites *Fought*, 379 F.3d at 1006, which provides that if a plan administrator operates under an

"inherent conflict of interest," the reviewing court must decrease the amount of deference given to the benefits decision, and "the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence."  This type of automatic burden-shifting strikes the Court as being at odds with *Glenn*'s directive to consider an inherent conflict simply as one factor in the Court's analysis.  In fact, *Glenn* appears to expressly reject the notion of an automatic burden-shifting rule when it notes that the Court does not "believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly on the evaluator/payor conflict" when evaluating benefit denials.  *Glenn*, 128 S.Ct. at 2351.  It also seems at odds with *Glenn*'s explanation that the weight of a conflict of interest as a factor to consider might approach "the vanishing point" under certain circumstances.  *Id*.  Similarly, although *Weber* did not directly address *Fought*'s automatic burden-shifting in light of *Glenn*, in evaluating the administrator's decision in its case, the *Weber* court did not shift the burden to the plan administrator to establish the reasonableness of its decision despite the fact that the defendant was both plan administrator and insurer.  *See Weber*, 541 F.3d at 1011.  The Court need not resolve this question, however, because even if it shifted the burden to Defendant to prove the reasonableness of the administrator's decision, the Court finds that Defendant's decision was supported by substantial evidence.

## DISCUSSION

Under the terms of the Plan, Plaintiff bore the burden of providing evidence to Defendant that she satisfied, and continued to satisfy, the Plan's definition of disability.  Rec. 15, 53-54. Defendant, as administrator of the Plan, expressly retained the discretion to determine whether such proof of initial and continued disability was satisfactory.  *Id*. at 32, 71.  Of course, such

6

discretion on the part of Defendant is not unlimited–the administrator must review all claims in good faith and with sufficient thoroughness to make a reasonable decision supported by substantial evidence. *See Weber*, 541 F.3d at 1010. Based on the information in the administrative record as discussed below, even applying a somewhat lower degree of deference because of Defendant's inherent conflict of interest as both Plan administrator and payor, the Court cannot say that Defendant's decision to terminate Plaintiff's LTD benefit payments was arbitrary and capricious.

     A.     Initial Approval of LTD Benefits

At the end of August 2005, Plaintiff submitted her application for basic LTD benefits under the Plan. Rec. 517-31. This application stated that she could not work because of extreme pain in her right hand and arm, and that she was "not able to use [her] right extremities properly." *Id.* at 518. She attached a statement from her attending physician, Dr. Hung Quan, from August 2, 2005, that indicated that her ability to use a keyboard was limited due to "right wrist pain,"and that prescribed limitations to repetitive hand motions, lifting, and carrying objects with the right hand. *Id.* at 522. However, Dr. Quan placed no other limitations on Plaintiff, such as on standing, walking, or sitting. *Id.*

In connection with its review of Plaintiff's claim, Defendant obtained the records of Dr. Irwin Isaacs, who was treating Plaintiff's pain. Dr. Isaacs reported that Plaintiff's primary complaint was pain in her head, neck, shoulder, and arm. *Id.* at 509. On August 2, 2005, Dr. Isaacs diagnosed Plaintiff with cervical facet syndrome and performed cervical facet injections to treat her "headaches, neck pain, and upper shoulder pain." *Id.* at 510. On September 16, 2005, Dr. Isaacs performed "radio frequency neurotomy to give [Plaintiff] long-term relief" and noted that previously performed medial branch nerve blocks had given Plaintiff "better than 70% pain

7

relief." *Id.* at 459. To further help assess Plaintiff's claim, Defendant also sought a functional assessment of Plaintiff from Dr. Isaacs, but Dr. Isaacs was unable to complete such an assessment "due to the lack of authorization from the patient." *Id*. at 471.

In a September 19, 2005 telephone interview with one of Defendant's examiners, Plaintiff acknowledged that she was taking art and music classes at Albuquerque Technical Vocational Institute, but indicated that she used a tape recorder and was not required to write, that she did not take notes, and that she was not doing well in her classes. *Id*. at 115. The following day, Plaintiff called Defendant "to clarify some things," and stated that "she can't work anymore, and there is no work she can do," because she is "in pain all the time." *Id*. at 114-115.

On October 6, 2005, one of Defendant's in-house nurses prepared a three-page preliminary summary of all medical documentation received concerning Plaintiff. *Id.* at 109-111. The nurse did not provide an assessment of the case, however, because Defendant was still awaiting further medical records from Plaintiff's physicians. On October 20, 2005, Defendant's nurse spoke with Dr. Isaac's nurse, who reported that Plaintiff had been responding well to her pain treatment and that Plaintiff had reported to Dr. Isaac's office the previous day that she was "doing better, no problems." *Id*. at 106. Dr. Isaac's nurse also stated that, based on radio frequency neurotomy treatment, Dr. Isaacs expected Plaintiff's pain level to be significantly improved, or that she may even be pain free. *Id*.[2]

_____

[2] Defendant's brief in support of its motion for judgment on the papers (hereinafter "Deft's brief")[Doc. 20] states that the administrative record indicates that Defendant's nurse also spoke with Dr. Quan on October 20, 2005, and that Dr. Quan stated that Plaintiff's "level of function [wa]s unclear." Deft's brief [Doc. 20] at 7. A closer look at this portion of the administrative record cited by Defendant reveals that the record only discusses a telephone call made to Dr. Quan's office, with a message left with a nurse asking for a return call from Dr. Quan, and that the characterization that Plaintiff's "level of function [wa]s unclear" is that of Defendant's nurse leaving the message, rather than the characterization of Dr. Quan.

On October 21, 2005, Defendant's nurse prepared her assessment of Plaintiff's claim. The nurse noted Plaintiff's diagnosis of cervical facet syndrome, and the expectation that Plaintiff would have significant improvement of symptoms or be symptom free by her next evaluation. *Id.* at 105. Citing Dr. Isaac's findings, the nurse concluded that "it is reasonable to support a functional impairment to [Plaintiff's] job duties of repetitive use of her right hand to allow for treatment and re-evaluation," and that a "change in function is expected by 11/15/05." *Id.* The nurse recommended follow-up with Plaintiff's physicians by November 15, 2005, for further functional assessments and an update on Plaintiff's restrictions and her ability to return to work. *Id.* Based on the medical documentation and the nurse's assessment, Defendant approved Plaintiff's claim, effective back to September 28, 2005. *Id* at 103-104. Through a telephone call on October 21, 2005, and a letter sent out that same day, Defendant notified Plaintiff that her claim for LTD benefits had been approved.

 B. <u>Investigation of Plaintiff's Continued Eligibility for Benefits</u>

On January 24, 2006, one of Defendant's claim examiners conducted a follow-up telephone interview with Plaintiff to determine how she was progressing. Plaintiff stated that she needed her mother to drive her places because of the effect of pain medications, which she has to take "all the time," although she admitted that she did occasionally drive to the store if necessary. *Id* at 100. She reported that she could not turn her head to look at traffic, and is "home bound, does not go out at all" except for the occasional trip to her mother's house. *Id.* She further stated that if she is out for more than one hour, she has to come home because she cannot hold her neck up, and that she does not attend any outside social activities. *Id.* Finally, she indicated that she just "lets her dog out, but does not walk her."

Following the conversation with Plaintiff, Defendant's examiner referred the file to

Defendant's Special Investigation Unit ("SIU").  *Id*. at 413.  In summarizing the basis for the

referral, Defendant's examiner noted Plaintiff's diagnosis of Cervical Facet Syndrome, her

complaints, and that she claims not to have received relief from her treatment, but noted that her

"function is unclear and does not correlate with medical records received in file."  *Id*.  The SIU

authorized video surveillance of Plaintiff.  *Id*. at 560-63.  The investigator conducted surveillance

on February 6-8, 2006, and again on March 6-7, 2006.  The investigator presented the results of

his surveillance through video, still photos, and a written description.

The material gathered by the investigator starkly called into question Plaintiff's claims of

being home bound, unable to be out for more than an hour, unable to walk her dog, and unable to

use her right hand.  During the February surveillance, Plaintiff was observed walking her dog

while holding its leash in her right hand, driving her car to several locations, remaining away

from her apartment for over four hours, and walking around the campus where she was taking

classes, all without any outward signs of pain or impairment in the judgment of the investigator.

*Id*. at 570-573.  During the March surveillance, Plaintiff was observed walking her dog for nearly

one hour while occasionally bending ninety degrees and picking up her dog's feces in a bag with

her right hand, climbing stairs and walking throughout her campus, and being away from home

for more than three hours at a time on both days while driving to multiple locations, again without

any outward signs of pain or impairment in the judgment of the investigator.  *Id.* at 584-90.

On April 25, 2006, one of Defendant's claims investigators made an appointment to meet

with Plaintiff at her home in order to "provide[] her with a good faith opportunity to describe her

level of functionality, and to explain any inconsistencies the investigation has developed."  *Id*. at

595.  The investigator did not immediately mention the surveillance video, but instead sought to

get Plaintiff's description of her limitations.  Over the course of an approximately 3.5 hour

interview, Plaintiff favored her right arm and hand, moved sluggishly, moaned, cried, and

complained of pain.  *Id*. at 596.  She described her limitations as including being unable to walk

more than two blocks without having to rest, being unable to stand for more than fifteen minutes,

being unable to carry anything in her right hand or lift anything with her right arm, being unable

to bend more than thirty degrees, having no grip strength in her right hand, and being able to

drive for only twenty minutes.  *Id*. at 599-602.  When shown the surveillance videos by the

investigator that demonstrated Plaintiff performing activities that greatly exceeded each of her

stated limitations, Plaintiff acknowledged that she was the person in the videos and that she had

been unaware of the surveillance.  *Id*. at 595.  She explained her activities in the videos by stating

that they "represented her above normal level of functionality."  *Id*.

 Plaintiff objects to Defendant's use of video surveillance and reliance on that surveillance

as one of its factors in determining that Plaintiff is not disabled.  *See* Plaintiff's Motion for

Judgment on the Administrative Record (hereinafter "Pl. Mot.") [Doc.  19] at 11; Pl. Resp. [Doc.

22] at 13.  In addition to criticizing Defendant's decision to undertake surveillance in the first

place, Plaintiff argues that the amount of activity captured on tape (approximately 32 minutes)

over the five days of surveillance does not show an ability to sustain such a level of activity on a

continuous basis, and that the video is of little significance because it does not demonstrate that

Plaintiff was capable of performing the essential duties of her occupation and therefore cannot

serve as substantial evidence for Defendant's decision to discontinue benefit payments.  Plaintiff

also claims that Defendant's use of the surveillance tape in making its determination that she was

not disabled necessarily meant that Defendant assumed that "only something [as] extreme" as

"be[ing] bedridden and immobile during every second of the day" would disable her from

working.  Pl. Mot. [Doc. 19] at 13.

The Court does not find that Defendant's use of the results of its surveillance as one piece of evidence that it used to make its determination rendered that determination arbitrary and capricious.  Plaintiff had represented herself to be extremely limited in her functionality, maintaining that she could not walk for more than two blocks without resting, could not stand for more than fifteen minutes, could not be away from home for more than an hour, and could not use her right hand.  The tape and accompanying narrative of the surveillance by the investigator indicated that Plaintiff had a significantly higher degree of functionality than she had claimed in her application and interview.[3]  In a case such as this one, where Plaintiff's claimed disability stems largely from her subjective representations of pain and accompanying physical limitations, her credibility is paramount.  Surveillance showing Plaintiff exceeding her claimed limitations on each of the days in question is evidence that Defendant could quite reasonably consider in making its determination.

On May 3, 2006, one of Defendant's claim examiners prepared a summary of her analysis of the evidence, noting Plaintiff's job requirements (as verified through a call to a Sprint representative), the most recent limitations received from her physicians, Plaintiff's subjective description of her limitations, the surveillance evidence, and results of the recent in-person interview.  *See* Rec. at 96-97.  The summary also noted that Plaintiff had received two Bs and one A in her coursework at Albuquerque Technical Vocational Institute since she began receiving

---

[3] That the length of the video tape is short compared to the total surveillance time does not serve to discount the importance of the surveillance.  The investigator's written description of Plaintiff's activities is just as relevant as the video footage.  If Plaintiff claims to be unable to walk her dog but is shown leaving her home while walking the dog on a leash and shown at various points during what the investigator described as over an hour long walk, footage of the entire walk is unnecessary.

LTD benefits in the Fall of 2005, that she was currently enrolled in a writing course and a problem solving methods course at the college, and that the school had no record of Plaintiff requesting any special assistance with respect to her claimed limitations.[4]  *Id*.  The examiner noted many of the inconsistencies between Plaintiff's claims and the objective evidence, and referred the file for further review.  *Id*.

On May 9, 2006, one of Defendant's in-house nurses reviewed the evidence and prepared an assessment that also cited many of the inconsistencies in the record.  *Id*. at 93-95.  He indicated that he would send a copy of the surveillance evidence to Plaintiff's primary physician, Dr. Dvorak, for review and comment.  *Id*. at 95.  By a letter dated the same day, Defendant sent the surveillance video, narrative, interview transcript, and assessment of functional capacity to Dr. Dvorak.  *Id*. at 339-40.

The following week, Dr. Dvorak left a voice message for Defendant's examiner indicating that the video surveillance evidence did not change his opinion regarding Defendant's disability.  *Id*. at 92-93.  He also returned a handwritten notation of his position, which included his suggestion that Defendant seek an independent occupational medical evaluation "if [they] feel strongly about this."  *Id*. at 338.  In a May 17, 2006 letter to Dr. Dvorak, Defendant confirmed Dr. Dvorak's voice message and notified him that Defendant would be seeking an independent peer review of Plaintiff's file.  *Id*. at 337.

Defendant then forwarded Plaintiff's file to the Medical Advisory Group LLC ("MAG") in Plaistow, New Hampshire, for review.  Dr. F.B. Dibble, Jr., who is Board Certified in Family Practice, conducted the review.  *Id*. at 329.  In a report dated May 25, 2006, Dr. Dibble opined on

---

[4] In fact, Plaintiff acknowledged in her face-to-face interview on April 25, 2006, that she did not require any special accommodations when taking classes.  *See* Rec. at 603.

Plaintiff's condition, basing his conclusion on a review of medical records, the surveillance evidence, and a telephone interview with Dr. Dvorak. *Id.* at 326-29. Dr. Dibble noted that, by his own admission, Dr. Dvorak had not undertaken an objective assessment of Plaintiff's physical capabilities, and that Dr. Dvorak "said that he saw no evidence of muscular atrophy, weakness, discoordination, or findings that would establish a diagnosis of complex regional pain syndrome. *Id.* at 328. Dr. Dibble also noted that Dr. Dvorak "was not of the opinion that [Plaintiff] had carpal tunnel syndrome" and that Dr. Dvorak stated that "he would be unable to make any specific assessment of [Plaintiff's] capabilities for activity of employment or limitations from activities of employment without a more formal occupational therapy appraisal." *Id.* Dr. Dvorak also indicated to Dr. Dibble that it was Plaintiff's self-reported pain that caused her limitation of activities. *Id.*

Dr. Dibble cited the inconsistencies between Plaintiff's subjective complaints and the physical evidence, and pointed out that no objective evidence in Plaintiff's medical file indicated a condition that would lead to a debilitating physical limitation. He noted that she had "no evidence of any muscular atrophy, reflex impairment, impaired range of motion of her joints, or peripheral circulation that would be associated with any physical limitation." *Id.* at 329. He also indicated that imaging studies of her brain and cervical spine, as well as electrophysiologic studies of her upper right extremity were largely without abnormality with the exception of a very small disc herniation in the cervical spine that did not effect either the central canal or nerve roots. *Id.* Dr. Dibble concluded that Plaintiff had "no evidence of any specific impairment that limits her physical functioning in any way" and that "it is my medical opinion with a reasonable degree of certainty that Molly Rizzi is not restricted from performing full-time work." *Id.*

By a letter dated June 7, 2006, Defendant notified Plaintiff of its determination to terminate her LTD benefits.  The letter provided a detailed summary of the evidence on which it had based its decision.  *Id*. at 321-25.  The letter also notified Plaintiff of her right to appeal the determination.  *Id*. at 324.

C.      Plaintiff's Administrative Appeal

By a letter dated November 8, 2006, Plaintiff, through her attorney, Victor Roybal, Jr., submitted an appeal of Defendant's determination.  *Id*. at 270-79.  The appeal challenged Defendant's reliance on a non-examining physician, claimed that Defendant failed to demonstrate that Plaintiff was capable of performing her usual occupation, concluded that the surveillance evidence was "unpersuasive" in showing that Plaintiff could perform all of her duties, and charged Defendant with failing to properly develop the medical record to document the extent of Plaintiff's functional limitations.  *Id*.  Plaintiff attached to the appeal a "Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment" form prepared by Mr. Roybal and filled out by Dr. Dvorak at some point after the termination of benefits, reiterating Dr. Dvorak's opinion that Plaintiff was unable to perform sustained sedentary work on a regular basis.  *Id*. at 280-86.[5]  In addition to supplementing Plaintiff's file with the appeal letter and Dr. Dvorak's form, Defendant also added a copy of a letter dated June 6, 2006, in which Dr. Dvorak noted that Plaintiff had scheduled a nerve conduction study with a neurology consultant in the next week.  *Id*. at 312.

On December 6, 2006, as part of its review of the appeal, Defendant's examiner left a

---

[5] The last page of the form indicates that Dr. Dvorak signed it on August 24, 2006.  Rec. at 286.  However, the first page of the form contains Dr. Dvorak's signature and a date of September 20, 2006.  *Id*. at 280.  Thus, it is unclear from the record exactly when the form was completed.

message for Mr. Roybal asking to see the results of the neurologic study referred to in Dr. Dvorak's June 6 note.  *Id*. at 87.  On December 11, 2006, Mr. Roybal indicated his recollection that Plaintiff had not yet seen a neurologist, although he believed she had an upcoming appointment, and that he had already submitted all available medical records for consideration in the appeals process.  *Id*.

In connection with Plaintiff's appeal, Defendant arranged for a second medical peer review.  The second review was conducted by Dr. Jerome Siegel, a physician Board Certified in Internal Medicine and Occupational Medicine.  *Id*. at 213.  Defendant retained Dr. Siegel through a contract with University Disability Consortium ("UDC") of Newton Highlands, Massachusetts. *Id*. at 198.  In addition to the information contained in Plaintiff's initial file, Dr. Siegel reviewed all of the additional medical information submitted by Mr. Roybal as part of his request for reconsideration.  *Id*. at 84.  In an attempt to ensure that Dr. Siegel's opinion was independent and free from bias, Defendant did not provide him with a copy of Dr. Dibble's report.

In a detailed report dated January 16, 2007, Dr. Siegel summarized the evidence in the claim file, described his telephone discussions with Dr. Dvorak about the case, and presented his opinions.  *Id*. at 198-213.  Dr. Siegel found that Plaintiff's "subjective complaints of pain far outweigh objective physical examination, or imaging abnormalities."  *Id.* at 212.  Because Plaintiff's complaint rests so heavily on her subjective reporting rather than objective evidence, Dr. Siegel carefully reviewed the surveillance evidence and found that it "raises questions about the severity and functional impairments of [Plaintiff's] right upper extremity."  *Id*. at 211.  He noted the lack of evaluation by a hand surgeon or psychiatrist, and lack of a recent evaluation by a neurologist, and concluded that the "medical records and videotape do not substantiate the [Plaintiff] is physically impaired from performing sedentary to light physical demand work

16

activities." *Id*. at 212.  While Dr. Siegel did note some physical restrictions, such as the need to alternate sitting and standing, limited repetitive use of her upper right extremity, and limited typing, he found that "the information presented does not substantiate why [Plaintiff] could not return to sedentary to light physical demand work activities as would be expected as part of her regular work activities at Sprint." *Id*. at 213.[6]

On January 17, 2006, Defendant's appeals examiner summarized her final analysis of Plaintiff's appeal, and found the previous determination terminating benefits to be proper.  *Id*. at 84-86.  Based on this analysis, Defendant upheld its decision and notified Plaintiff of its determination in a letter dated January 18, 2006.  *Id*. at 222-24.  This letter outlined all of the evidence that Defendant considered in reaching its conclusion and thoroughly discussed its determination with respect to Plaintiff's job duties and definitions contained in the Plan.  *Id*.  It also informed Plaintiff and her attorney that Plaintiff had exhausted her administrative remedies under the Plan, and that the decision was final and binding.  *Id*. at 224.

After Defendant rendered its decision, Plaintiff's attorney attempted to submit further information, including a record dated January 27, 2007, from Dr. Dvorak.  *See* Pl. Resp. [Doc. 22] at 5-6; Pl. Mot. [Doc. 19] Ex. 1.  Defendant refused to accept this additional information, notifying Mr. Roybal that the claim file was closed following the final appeal, and returning the information to him.[7]  Rec. at 123.  Plaintiff additionally later sought Dr. Siegel's curriculum vitae

---

[6] Dr. Siegel also found that issues related to mental health and emotional factors may be playing a role in Plaintiff's inability to return to work, but noted that not only are such issues are outside the scope of his review, but also that the file contains no psychiatric or psychological evaluations.  Rec. at 212.

[7] Because the additional information submitted by Plaintiff was not part of the administrative record, and the Court's duty is to determine whether Defendant's decision was arbitrary and capricious based solely on the administrative record at the time Defendant made its

from Defendant, which Defendant also refused to provide, stating that it not only did not possess such a document, but that the document was also not considered in rendering the appeals determination, and was therefore not relevant to the determination. *Id*. at 121.

   D.   Alleged Procedural Irregularities

   Plaintiff contends that procedural irregularities affected Defendant's review of her claim, but she does not cite any irregularities relating to the initial review of her claim or to the decision to terminate LTD benefits. Instead she focuses on the handling of her administrative appeal. Plaintiff first contends that Defendant's review of her appeal was untimely. This contention is unfounded. Defendant received Plaintiff's appeal on November 13, 2006, and notified Mr. Roybal on November 15, 2006 that it was in receipt of the appeal. *Id*. at 269. The letter also stated that, under ERISA, Defendant generally has 45 days to respond to the request, but that if special circumstances warrant a delay, Plaintiff would be notified. Under no circumstance may review exceed 90 days. *Id*. As described earlier, in conducting its review of the record, Defendant's appeals specialist ran across Dr. Dvorak's notation that Plaintiff was scheduled for a neurology consult and nerve conduction studies, and she sought to obtain the results of these exams from Plaintiff's attorney. To this end, she left a message with Mr. Roybal on December 6, 2006. *Id*. at 158. Defendant received additional medical records from Mr. Roybal on December 11, but these records did not include any information regarding a neurology consult or nerve conduction studies. *Id*. at 157. The administrative record indicates that Defendant's appeals specialist spoke with Mr. Roybal on that day to indicate that she had still not received the neurology records, and Mr. Roybal apparently indicated his understanding that Plaintiff had not

_____

 decision, the Court did not consider any additional evidence in reaching its conclusion.

seen a neurologist and that he had submitted all available records.  *Id*.  Based on that

conversation, Defendant sent a letter on December 11 to Mr. Roybal confirming that Mr. Roybal

had now submitted all additional medical information that he wanted to be taken into

consideration, and that the file was therefore considered complete and ready to proceed with.  *Id*.

at 248.  The letter indicated that, based on receiving the updated medical records that completed

the file on December 11, 2006, the 45 days for appeals to render a decision would end on January

27, 2007.  Defendant rendered the decision on January 18, 2007, well before this deadline.  At no

point did Mr. Roybal question or object to the new deadline for completion of the appeal, either

when informed of the new deadline or after the decision was rendered.  Defendant noted the need

for a complete set of records before proceeding with the appeal, contacted Mr. Roybal to obtain

those records, confirmed the completeness of the appeals submission, and notified Plaintiff of the

new deadline.  If anything, moving ahead with the appeal before Defendant received a full set of

medical records would have been improper.  Defendant's actions in ensuring a complete file do

not constitute a procedural irregularity.

Plaintiff also contends that procedural irregularities occurred relating to Dr. Siegel's

report because Defendant failed to inform her of its intention to obtain a second medical review,

failed to provide a copy of the report with the appeal determination letter, denied her an

opportunity to respond to Dr. Siegel's report with additional information, and refused to provide

her with a copy of Dr. Siegel's curriculum vitae.  As recognized by the Tenth Circuit,

"[p]ermitting a claimant to receive and rebut medical opinion reports generated in the course of

an administrative appeal...would set up an unnecessary cycle of submission, review, re-

submission, and re-review."  *Metzger v. Unum Life Ins. Co. of Am.*, 476 F.3d 1161, 1166 (10th

Cir. 2007).  Because "such repeating cycles of review within a single appeal would unnecessarily

increase cost of appeals," *id*. at 1166-67, the *Metzger* court held that ERISA regulations do "not

require a plan administrator to provide a claimant with access to the medical opinion reports of

appeal-level reviewers prior to a final decision on appeal." *Id*. at 1167.  Consequently, Defendant

had no obligation to initially inform Plaintiff of Dr. Siegel's review or to provide her with an

opportunity to respond to the report.

Defendant complied with the requirement that "relevant documents generated during the

administrative appeal – along with the claimant's file from the initial determination – must be

disclosed after a final decision on appeal," *id*, by providing a copy of Dr. Siegel's report on

January 26, 2007.  *See* Rec. at 195.  Nonetheless, Plaintiff asserts that Defendant prevented access

to Dr. Siegel's credentials, thereby withholding relevant documentation.  However, a document is

only considered "relevant," and therefore required to be provided to a claimant, if it was "relied

upon in making the benefit determination" or "submitted, considered, or generated in the course

of making the benefit determination."  *Metzger*, 476 F.3d at 1166; 29 C.F.R. § 2560.503-1(m)(8).

Because Dr. Siegel's curriculum vitae was not part of the claim file considered by Defendant, it is

not a relevant document and Defendant was under no procedural obligation to provide it to

Plaintiff.

      E.     <u>Reliance on Outside Physicians</u>

Plaintiff also claims that Defendant's reliance on the opinions of Dr. Dibble and Dr.

Siegel as non-examining and non-treating physicians was unreasonable, and that these physicians

were inherently biased.  She cites the ongoing relationship that both of the consulting firms with

which the doctors are associated have with Defendant, and, as evidence, provides a list of 41

cases nationwide that referenced either MAG or UDC as a consultant to Defendant's plan

administrator.  Pl. Mot. at 14-17.  Plaintiff then cites *Black & Decker Disability Plan v. Nord*, 538

U.S. 822, 832 (2003), which found that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and preserve their own consulting arrangements'" (internal citation omitted).  Undoubtedly, the relationship between a plan administrator and its medical consultants is material to the Court's determination of whether the administrator's decision was arbitrary and capricious, especially in a case in which the consultants' opinions contradicted the opinion of the claimant's treating physician.  However, Plaintiff has failed to demonstrate bias on the part of the consultants that would lead the Court to conclude that reliance on their opinions by Defendant was arbitrary and capricious.

In the 41 cases cited by Plaintiff, only four involved Dr. Dibble, including one in which Dr. Dibble's consulting opinion supported the claimant and led to Defendant reversing its denial of benefits.  *See* Def't. Resp. [Doc. 24] at 10; *Frei v. Hartford Life Ins. Co.*, 2006 WL 563051 at *2 (N.D. Cal. 2006).  Dr. Siegel appears in only two of the cases cited by Plaintiff.  *See* Def't. Resp. [Doc. 24] at 11.  If anything, Plaintiff's list demonstrates that the consulting firms retained by Defendant to provide reviews of its case files utilize many different physicians.  Plan administrators are entitled to seek independent medical review of case files, and a system that prevented them from using members of a consortium or that required them to identify and hire a new physician for every single review would be untenable.  Certainly a history of biased opinions from a particular physician or consortium would be relevant information for a reviewing court to take into consideration, but Plaintiff has demonstrated no improper bias on the part of Defendant's consulting physicians such that it was improper for the plan administrator to rely on their opinions in reaching its decision.

F.     <u>Objective and Subjective Evidence</u>

Plaintiff further argues that Defendant unreasonably relied solely on objective evidence to the exclusion of considering Plaintiff's subjective complaints. This does not accurately capture Defendant's decision-making process from the Court's review of the administrative record. Defendant and its consultants appeared to focus on attempting to find evidence of a disabling impairment rather than simply reviewing a diagnosis of Plaintiff's medical condition. The thorough reports by Defendant and its consultants reasonably looked to objective measures of Plaintiff's condition, such as CT scans, MRI scans, X-rays, neurological exams, and nerve conduction studies. When these objective measures, as well as concrete visual evidence, failed to support the existence of a disabling loss of functionality such as would be required for continuation of LTD benefits, Defendant reasonably denied her claim. This is not to say that a claim based largely on subjective complaints of disabling pain could not support a claim for disability if the pain caused a disabling impairment. But the subjective nature of Plaintiff's complaint necessarily required that the medical inquiry be intertwined with judgments about Plaintiff's credibility, which are reserved to the discretion of the plan administrator. The administrator reasonably exercised that discretion in this case.

G.    Psychiatric Factors

Finally, Plaintiff contends that Defendant unreasonably failed to investigate whether Plaintiff's depression and anxiety caused her to be disabled. However, Plaintiff failed to present any proof of a psychiatric impairment. Her initial claim for disability cited no psychiatric issues, and the physician statement supporting her claim indicated that she was functioning well both occupationally and socially. *See* Rec. at 522. Plaintiff's continuing disability statement, dated April 25, 2006, also failed to identify depression or anxiety as conditions preventing her return to work. *Id*. at 373-381. Nor did Plaintiff ever identify a psychiatrist or psychologist as one of her

treatment providers or submit any mental health records or evaluations.  While Dr. Dvorak indicated his belief that Plaintiff had depression and anxiety secondary to her pain, he did not identify any occupational limitation attributable to depression or anxiety, nor did he refer her to a mental health professional for treatment.  And although Plaintiff's attorney listed depression and anxiety as among Plaintiff's conditions in his appeal letter, he provided no medical documentation for the record that would support a disability determination attributable to depression or anxiety.  Under the Plan and the applicable caselaw, Plaintiff bore the burden of proving her disability claim.  *See* Rec. at 15, 53-54; *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992).  While a plan administrator may not simply ignore relevant evidence supporting a disability determination, neither does an administrator have the obligation to conduct an investigation into every potential limitation of a claimant, especially if such grounds are not developed by the claimant.  In this case, if Plaintiff wanted her mental condition to be considered as a contributing factor to her disability claim, she had the responsibility to offer proof of a psychiatric impairment.  That she offered no such proof cannot be blamed on Defendant.

## **CONCLUSION**

In short, the Court's role in this case is not to referee a battle of physicians or to decide whether Defendant's decision to terminate Plaintiff's LTD benefit payments was correct.  It is simply to determine whether Defendant reasonably exercised its discretion and based its determination on substantial evidence.  After a thorough review of the administrative record, even with giving Defendant's findings a reduced level of deference due to its inherent conflict of interest, the Court concludes that Defendant has shown that its claim determination was reasonable.  **IT IS THEREFORE ORDERED** that Plaintiff's *Motion for Judgment on the*

*Administrative Record* [Doc. 19] is DENIED and Defendant's *Motion for a Bench Trial on the Papers* [Doc. 20], which the Court is treating as a motion for judgment on the pleadings, is GRANTED.

**UNITED STATES DISTRICT JUDGE**